UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x
MARIA COLLAZO,

                Plaintiff,

      -against-                  <u>MEMORANDUM & ORDER</u>
                                        12-CV-2196(JS)(GRB)
COUNTY OF SUFFOLK and NANCY D'AMBROSIO,
in her individual capacity pursuant to
42 U.S.C. § 1983,

                Defendants.
------------------------------------x
APPEARANCES
For Plaintiff:       Scott M. Mishkin, Esq.
                   Kyle T. Pulis, Esq.
                   Scott Michael Mishkin, P.C.
                   One Suffolk Square, Suite 520
                   Islandia, NY 11749

For Defendant:       Rudolph Max Baptiste, Esq.
                   Suffolk County Attorney's Office
                   100 Veteran's Memorial Highway
                   Hauppauge, NY 11788

        Plaintiff Maria Collazo ("Plaintiff" or "Collazo") commenced this action alleging violations of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000 <u>et. seq.</u> ("Title VII"), and 42 U.S.C. § 1983 ("Section 1983") in connection with discrimination and retaliation based on race, ethnicity, and national origin. (<u>See</u> Am. Compl., Docket Entry 22.) Presently pending before the Court is the motion for summary judgment filed by defendants County of Suffolk ("the County") and Nancy D'Ambrosio (collectively, "Defendants"). (Defs.' Mot., Docket Entry 45.)

For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART.

BACKGROUND[1]

I.  Factual Background

Collazo is a Puerto Rican female who identifies as Latina/Hispanic.  (Defs.' 56.1 Stmt., Docket Entry 39-1, ¶ 7.) Collazo's first language was Spanish but she speaks English at home.  (Defs.' 56.1 Stmt. ¶ 7.)  Collazo began employment with defendant County of Suffolk (the "County") on or about June 6, 1994.  (Pl.'s 56.1 Counterstmt., Docket Entry 47-1, ¶ 55.)  In or about March 2008, Collazo began working as a supervisor in the Home Energy Assistance Program ("HEAP") unit of the County's Department of Social Services ("DSS"), which assists needy residents with utilities. (Defs.' 56.1 Stmt. ¶¶ 1- 3, 6.)  Collazo alleges that she "received praise and positive performance evaluations throughout her employment at the County."  (Pl.'s 56.1 Counterstmt. ¶ 61.)

Collazo alleges that in September 2008, defendant Nancy D'Ambrosio ("D'Ambrosio") called her and advised that she was transferring to HEAP and "was not familiar with the department, and that she was going to need plaintiff to help her in any way

_____

[1] The following material facts are drawn from Defendants' Local Civil Rule 56.1 Statement and Plaintiff's Local Civil Rule 56.1 Counterstatement.  Any relevant factual disputes are noted.

that she could." (Pl.'s 56.1 Counterstmt. ¶ 9.) In or about October 2008, D'Ambrosio began working as the HEAP Coordinator and served as Collazo's supervisor. (Defs.' 56.1 Stmt. ¶ 4.) D'Ambrosio reported to Kenneth Knappe ("Knappe"), a project management analyst. (Defs.' 56.1 Stmt. ¶ 40.)

Defendants allege that Collazo and D'Ambrosio "enjoyed an office friendship" and that D'Ambrosio attended Collazo's daughter's wedding in or about March 2009. (Defs.' 56.1 Stmt. ¶ 9.) Defendants allege that Collazo "volunteered" to make D'Ambrosio coffee, while Collazo avers that she occasionally assisted D'Ambrosio with making coffee "because it appeared that [D'Ambrosio] was struggling due to her disability." (Defs.' 56.1 Stmt. ¶ 38; Pl.'s 56.1 Counterstmt. ¶ 9.) Collazo also alleges that D'Ambrosio expected that she make her coffee every day, including during meetings, but she did not require that other employees make her coffee. (Pl.'s 56.1 Counterstmt. ¶ 9.)

Collazo alleges that D'Ambrosio used racial epithets at work and referred to Ila Vora ("Vora"), who is Indian, as a "slum dog." (Pl.'s 56.1 Counterstmt. ¶ 9.) Collazo asserts that other employees overheard D'Ambrosio's "racial comments" and found them to be derogatory. (Pl.'s 56.1 Counterstmt. ¶ 9.)

Collazo alleges that she frequently spoke to two other Spanish-speaking employees, Donatila Melgar and Alicia Davila, in Spanish about work-related subjects. (Pl.'s Counterstmt. ¶¶ 67-

68.) Collazo also alleges that in or about July 2009, D'Ambrosio told her that she and other Spanish-speaking employees "could no longer speak Spanish at work," but D'Ambrosio did not prohibit other employees from speaking in their native languages. (Pl.'s 56.1 Counterstmt. ¶¶ 69, 72.) Collazo alleges that D'Ambrosio "overall gave preferential treatment to the non-Hispanic employees in plaintiff's unit." (Pl.'s 56.1 Counterstmt. ¶ 9.) While Defendants allege that "[t]here is no County or Suffolk DSS policy prohibiting or limiting the use of Spanish in the workplace," Collazo disputes this characterization. (Defs.' 56.1 Stmt. ¶ 8; Pl.'s 56.1 Counterstmt. ¶ 8.) Defendants allege that D'Ambrosio hired temporary employees to assist the County's Spanish speaking population in applying for benefits. (Defs.' 56.1 Stmt. ¶ 31.)

Collazo alleges that shortly after D'Ambrosio told her to stop speaking Spanish, she began withholding documents and information that were necessary for Collazo to perform her position. (Pl.'s 56.1 Counterstmt. ¶ 9.) Collazo avers that D'Ambrosio stripped her of her responsibilities and that their relationship was "hostile" by August 2009. (Pl.'s 56.1 Counterstmt. ¶ 9.) During that same month, Collazo alleges that D'Ambrosio referred her as "senorita" during a phone conversation. (Pl.'s 56.1 Counterstmt. ¶ 5.) Additionally, Collazo alleges that in August 2009, Knappe indicated that he wanted her to participate in interviewing and hiring temporary HEAP employees with

D'Ambrosio; however, D'Ambrosio would not permit Collazo to be involved in the hiring process. (Pl.'s 56.1 Counterstmt. ¶ 9.)

A. <u>Collazo's Internal Complaints and Requests to Transfer</u>

In August 2009, Collazo requested a transfer during a meeting with Knappe. (Defs.' 56.1 Statement ¶ 5.) During this meeting, Collazo complained to Knappe about being required to make coffee and being prohibited from speaking Spanish but she did not request that any action be taken against D'Ambrosio. (Defs.' 56.1 Stmt. ¶ 49.) Collazo alleges that Knappe "agreed that [D'Ambrosio's] behavior was inappropriate" but Collazo and Knappe agreed that she should not transfer out of D'Ambrosio's department at that time. (Pl.'s 56.1 Counterstmt. ¶ 5.)

In late August 2009, Collazo contacted DSS Commissioner Gregory Blass' ("Commissioner Blass") office. (Pl.'s 56.1 Counterstmt. ¶ 5; Defs.' 56.1 Stmt. ¶ 19.) Collazo's call was transferred to Knappe and Collazo advised Knappe of D'Ambrosio's treatment and requested a transfer. (Pl.'s 56.1 Counterstmt. ¶ 5.) Collazo took one week off from work at Knappe's advice; when she returned to work, she was told that her transfer request was denied. (Pl.'s 56.1 Counterstmt. ¶ 5.) On or about August 20, 2009, Collazo made a renewed request to transfer from HEAP to the DSS Service Center in Coram, citing her and her husband's health, her grandchild obligations, and her desire to work closer to her

home.  (Defs.' 56.1 Stmt. ¶ 10.)  Plaintiff alleges that this transfer request was denied.  (Pl.'s 56.1 Counterstmt. ¶ 80.)

On or about September 16, 2009, Collazo renewed her request to transfer during a meeting with Commissioner Blass and Assistant Commissioner for Personnel Traci Barnes ("Barnes"). (Defs.' 56.1 Stmt. ¶ 19.)  Collazo again complained about preparing coffee for D'Ambrosio and being prohibited from speaking Spanish in the workplace.  (Defs.' 56.1 Stmt. ¶ 50.)  Defendants allege that Barnes denied Collazo's transfer request by telephone "based on DSS operational need."  (Defs.' 56.1 Stmt. ¶ 20.)

B.  Smithtown Center

In or about October 2009, HEAP relocated to the Smithtown DSS Service Center (the "Smithtown Center").[2]  (Defs.' 56.1 Stmt. ¶ 12.)  Defendants allege that D'Ambrosio played no part in "supervising or executing" HEAP's relocation.  (Defs.' 56.1 Stmt. ¶ 33.)  However, Collazo alleges that D'Ambrosio was responsible for assigning cubicles at the Smithtown Center and that her assigned cubicle rendered her isolated from her coworkers.  (Pl.'s 56.1 Counterstmt. ¶ 33.)  Collazo further alleges that she was "not assigned any work at the Smithtown Center."  (Pl.'s 56.1

---

[2] While Plaintiff's 56.1 Counterstatement states that HEAP relocated in or about September 2009, Plaintiff's deposition testimony confirms that HEAP relocated to the Smithtown Center in October 2009.  (See Pl.'s 56.1 Counterstmt. ¶¶ 9, 12; Pl.'s Dep. Tr., Docket Entry 45-4, 343:11-344:9.)

Counterstmt. ¶ 9.) Collazo also alleges that she was the only individual who had issues with her security badge and "had difficulty entering the building." (Pl.'s 56.1 Counterstmt. ¶ 47.) Defendants aver that Suffolk DSS Special Investigations Unit ("SIU") programmed and issued security door access badges for the HEAP offices at the Smithtown Center. (Defs.' 56.1 Stmt. ¶ 47.)

Collazo also alleges that when HEAP relocated, her multiline telephone and long distance capabilities were removed even though she was required to contact Albany. (Pl.'s 56.1 Counterstmt. ¶ 9.) Before HEAP moved to the Smithtown Center, Collazo was assigned a multiline phone with long distance capabilities. (Pl.'s 56.1 Counterstmt. ¶ 42.) Collazo alleges that she was the only supervisor in her department that was not provided with a multiline telephone. (Pl.'s 56.1 Counterstmt. ¶ 91.) Defendants allege that when HEAP relocated to the Smithtown Center it switched to a call center and that D'Ambrosio was not assigned to and did not "play any role in" the call center. (Defs.' 56.1 Stmt. ¶¶ 37, 45.) D'Ambrosio and call center employees received training on multiline phones through DSS information technology. (Defs.' 56.1 Stmt. ¶ 46.) DSS assigned multiline telephones to call center staff, Vora, D'Ambrosio, and D'Ambrosio's secretary. (Defs.' 56.1 Stmt. ¶ 42.) Defendants allege that after Collazo complained, in writing, to Knappe and

D'Ambrosio regarding her inability to make long distance phone calls, DSS "rectified the issue." (Defs.' 56.1 Stmt. ¶ 44.) Defendants allege that D'Ambrosio directed Collazo to request training on the multiline telephones. (Defs.' 56.1 Stmt. ¶ 48.) However, Collazo alleges that she "requested training on the call center and multiline phones but never received any." (Pl.'s 56.1 Counterstmt. ¶ 37.)

C. <u>NYSDHR Complaint</u>

On October 29, 2009, Collazo filed a complaint "regarding race, national origin or ethnic discrimination relating to D'Ambrosio" with the New York State Division of Human Rights (the "NYSDHR Complaint"). (Defs.' 56.1 Stmt. ¶ 21.) The NYSDHR Complaint was sent to Defendants on November 5, 2009. (Defs.' 56.1 Stmt. ¶ 21.) Defendants allege that D'Ambrosio was not aware of Collazo's prior complaints to Barnes or Commissioner Blass until Plaintiff served her NYSDHR Complaint. (Defs.' 56.1 Stmt. ¶ 51.) Collazo disputes this assertion and alleges that D'Ambrosio reported to Knappe, who Collazo had complained to on multiple occasions, and that Collazo, Knappe, and D'Ambrosio met to discuss Collazo's transfer out of D'Ambrosio's department. (Pl.'s 56.1 Counterstmt. ¶ 51.) Particularly, Collazo alleges that in September 2009, D'Ambrosio was aware of her complaint to Knappe and was aware of her complaint about the "senorita" comment. (Pl.'s 56.1 Counterstmt. ¶¶ 86-87.) Collazo alleges that

D'Ambrosio was named in the NYSDHR complaint but she was not questioned, interviewed, or disciplined. (Pl.'s 56.1 Counterstmt. ¶ 95.)

D.   Southwest Center

On November 2, 2009, Collazo took a medical leave of absence due to depression and anxiety and did not return to work until August 23, 2010. (Defs.' 56.1 Stmt. ¶ 16.) When Collazo returned to work, she was reassigned from HEAP to the Undercare unit at the Southwest DSS Service Center (the "Southwest Center"). (Defs.' 56.1 Stmt. ¶ 22.) Collazo alleges that her supervisor at the Southwest Center, Steven Kramarcik ("Kramarcik"), "observed that [Collazo] always did a great job." (Pl.'s 56.1 Counterstmt. ¶ 25.) Collazo alleges that she advised Kramarcik about the NYSDHR Complaint and she complained to him about her issues with D'Ambrosio, particularly, D'Ambrosio requiring that she make coffee and "ma[king] her do chores because she was Hispanic." (Pl.'s 56.1 Counterstmt. ¶ 25.)

Collazo avers that in October 2010, Audrey Baird ("Baird") replaced Kramercik as the Center Manager of the Southwest Center. (Pl.'s 56.1 Counterstmt. ¶ 25.) Baird did not work with D'Ambrosio "in any capacity or form." (Defs.' 56.1 Stmt. ¶ 41.) Collazo alleges that on Baird's first day, she advised Baird of her issues with D'Ambrosio and her NYSDHR complaint. (Pl.'s 56.1 Counterstmt. ¶ 25.)

9

Collazo received a verbal reprimand and negative performance evaluation dated December 13, 2010 based on her failure to perform her job. (Defs.' 56.1 Stmt. ¶ 25; Dec. 13, 2010 Reprimand, Defs.' Ex. P, Docket Entry 45-17.) Defendants allege that this verbal reprimand only remained in Collazo's personnel file for six months and would have been removed had no further incidents been reported. (Defs.' 56.1 Stmt. ¶ 35.) However, Collazo alleges that Baird completed this performance evaluation based on less than one-month of observing Collazo despite the fact that performance evaluations are to be completed on the anniversary of the employee's hire date each year with Collazo's hire "anniversary" being in June. (Pl.'s 56.1 Counterstmt. ¶¶ 25, 117.) Collazo alleges that she had never received a negative evaluation before and she filed a "rebuttal" to Baird's evaluation. (Pl.'s 56.1 Counterstmt. ¶ 25.)

E.   Collazo's Application for HEAP Benefits

Collazo alleges that in or about November 2008, she "applied for a HEAP benefit because her husband had suffered a stroke, and she advised Nancy D'Ambrosio of her intention to apply for same." (Pl.'s 56.1 Counterstmt. ¶ 18.) Collazo further alleges that in March 2009, she applied for another HEAP benefit and advised D'Ambrosio of her application. (Pl.'s 56.1 Counterstmt. ¶ 18.) Defendants dispute this assertion and allege that Collazo never informed D'Ambrosio that she considered

applying for HEAP benefits or that her household had applied for emergency HEAP benefits. (Defs.' 56.1 Stmt. ¶ 52.) Collazo avers that Deborah Harrigan--who did not work in Collazo's department and was not under her supervision--reviewed her HEAP application. (Pl.'s 56.1 Counterstmt. ¶ 18.) Ms. Harrigan submitted Collazo's HEAP application "to be processed by accounting." (Pl.'s 56.1 Counterstmt. ¶ 18.) Collazo alleges that she did not "sign off" on her own HEAP application. (Pl.'s 56.1 Counterstmt. ¶ 18.)

F.    DSS Investigation of Collazo

In or about October 2009, shortly after the relocation of HEAP to the Smithtown Center, Collazo and other employees met with an SIU investigator and were provided notices for SIU interviews. (Defs.' 56.1 Stmt. ¶ 13.) Plaintiff was originally scheduled to meet with SIU on October 22, 2009; however, she obtained an adjournment to November 2, 2009. (Defs.' 56.1 Stmt. ¶ 14.) Collazo alleges that her attorney was unavailable and that he requested the adjournment. (Pl.'s 56.1 Counterstmt. ¶ 14.) Collazo did not honor her November 2, 2009 interview and did not subsequently reschedule. (Defs.' 56.1 Stmt. ¶ 15.) Sometime between October 22, 2009 and November 2, 2009, Collazo learned that Camille Bolster, a temporary HEAP employee, was investigated for "sign[ing] off" on her daughter's HEAP benefit application and ultimately terminated from DSS. (Defs.' 56.1 Stmt. ¶ 17; Pl.'s Dep. Tr., 394:14-394:19.)

On or about September 24, 2010, SIU commenced an investigation with respect to allegations of fraud in connection with two emergency HEAP benefits that were received by Collazo's household. (Defs.' 56.1 Stmt. ¶ 18.) The SIU investigation was commenced based upon information provided by D'Ambrosio, Vora, and two other HEAP employees. (Defs.' 56.1 Stmt. ¶ 18.) Collazo alleges that D'Ambrosio "reported to supervisors the possibility that [Collazo] fraudulently received 2 HEAP benefits." (Pl.'s 56.1 Counterstmt. ¶ 18.)

On or about October 18, 2010, Collazo was served with charges and specifications of incompetence and/or misconduct pursuant to New York Civil Service Law Section 75 (the "Misconduct Charges") and suspended for thirty days without pay. (Defs.' 56.1 Stmt. ¶ 23.) Collazo and the County proceeded to arbitration on the Misconduct Charges and presented testimony and witnesses on five days between June 1, 2011 and March 12, 2012 (the "Section 75 Hearing"). (Defs.' 56.1 Stmt. ¶ 27.) In an Arbitration Opinion and Award dated July 11, 2012 (the "Arbitration Decision"), the arbitrator sustained one charge and one specification of employee misconduct with respect to Collazo's receipt of two emergency HEAP benefits; found "just cause for discipline"; and recommended a demotion to a non-supervisory position. (Defs.' 56.1 Stmt. ¶ 28.) Collazo does not dispute that she recorded the Section 75 Hearing

without the consent of the parties or witnesses. (Def.'s 56.1 Stmt. ¶ 30; Pl.'s 56.1 Counterstmt. ¶ 30.)

Collazo commenced a proceeding in the New York State Supreme Court, Suffolk County and asserted claims of "arbitral misconduct, partiality and bias" (the "State Court Action"). (Defs.' 56.1 Stmt. ¶ 29.) Collazo alleges that she appealed the Arbitration Decision based on "ex parte conversations the arbitrator held without [her] attorney present." (Pl.'s 56.1 Counterstmt. ¶ 28.) The state court affirmed the Arbitration Decision in an Order dated January 2, 2014 (the "State Court Decision"). (Defs.' 56.1 Stmt. ¶ 29.) Collazo was not arrested or subject to criminal prosecution. (Defs.' 56.1 Stmt. ¶ 43.) Collazo alleges that she filed an appeal of the State Court Decision, which is currently pending. (Pl.'s 56.1 Counterstmt. ¶ 28.)

Collazo alleges that she did not "engage in any fraudulent conduct" by applying for HEAP benefits because: (1) the money discovered in her account during the investigation was from her income tax return and had been "earmarked" to pay property taxes; (2) "real estate taxes are exempt as a resource under the HEAP guidelines and do not need to be reported" and Collazo had no other resources to report; and (3) Collazo's household was "categorically eligible to apply because her daughter was

receiving SSI and her husband was disabled and over 60." (Pl.'s 56.1 Counterstmt. ¶ 113.)

G.   Transfer to Food Stamps Under Care

In or about December 2010, Collazo took a second medical leave of absence that ended in November 2011. (Defs.' 56.1 Stmt. ¶ 24.) When Collazo returned to work in or about December 2011, she was transferred to Food Stamps Under Care with Baird serving as her supervisor along with Christopher Wittneban ("Wittneban"). (Pl.'s 56.1 Counterstmt. ¶¶ 121-22.) Collazo alleges that in or about December 2011, she emailed her union vice president to complain about a "Hostile Work Environment." (Pl.'s 56.1 Counterstmt. ¶ 123.) Collazo alleges that she also advised Wittneban of her NYSDHR complaint against D'Ambrosio. (Pl.'s 56.1 Counterstmt. ¶ 124.) Collazo alleges that she was "subjected to increased supervision" by Baird and Wittneban, as Baird "walked back and forth in front of [Collazo's] office, accessed [Collazo's] computer when [Collazo] was at lunch, and required [Collazo] to submit her work to [Wittneban] everyday at the end of the day." (Pl.'s 56.1 Counterstmt. ¶ 125.) Collazo further avers that her coworkers were not subjected to the same treatment and despite her complaint, "nothing was done." (Pl.'s 56.1 Counterstmt. ¶¶ 125-26.)

H.   Collazo's Resignation

On or about May 25, 2012, Collazo resigned from DSS effective June 4, 2012. (Defs.' 56.1 Stmt. ¶ 26.) Collazo alleges that she "did not voluntarily resign, as she was threatened that if she did not resign, that the alleged Section 75 charges would be forwarded to the District Attorney's office for criminal prosecution." (Pl.'s 56.1 Counterstmt. ¶ 26.) Collazo further alleges that on or about May 8, 2013, she requested to be reinstated but did not receive a response from the County. (Pl.'s 56.1 Counterstmt. ¶ 26.)

## II. Defendants' Motion for Summary Judgment

On August 24, 2015, Defendants filed a motion for summary judgment. (See Defs.' Mot.) Defendants allege that Plaintiff has failed to sufficiently link racial animus to the allegation that D'Ambrosio made her prepare and serve coffee in light of Plaintiff's failure to mention race when complaining to Knappe and Barnes. (Defs.' Br., Docket Entry 45-26, at 5.) Similarly, Defendants allege that D'Ambrosio's conduct was not sufficiently severe and pervasive to create a hostile work environment and Plaintiff's reliance on derogatory remarks directed at another co-worker is misplaced. (Defs.' Br. at 6-7.) Defendants also argue that Plaintiff has failed to establish an adverse employment action or that she was constructively discharged. (Def.'s Br. at 23-27.) In any event, Defendants allege that they had a legitimate, non-discriminatory reason for any adverse employment actions--

namely, Plaintiff's misconduct in failing to provide notice to her superiors that she was making a HEAP application. (Defs.' Br. at 28.) Furthermore, Plaintiff failed to present evidence that the Arbitration Decision was "was wrong as a matter of fact" or that the arbitrator's impartiality was otherwise compromised. (Def.'s Br. at 29.)

Defendants argue that Plaintiff's allegations of a "policy inimical to Spanish speaking in the DSS' workplace" are without merit. (Defs.' Br. at 8.) To the contrary, DSS routinely attempts to assist the County's Spanish-speaking population and D'Ambrosio sought out employees who spoke Spanish. (Defs.' Br. at 8.) Defendants note that Plaintiff is bilingual and aver that she has not established that Defendants' alleged English-only workplace created a hostile work environment. (Defs.' Br. at 8-9.) Defendants argue that, D'Ambrosio's instruction that Plaintiff inform her subordinates not to speak Spanish was "supported by business necessity."[3] (Defs.' Br. at 14.)

_____

[3] The Court notes the dispute of fact as to D'Ambrosio's directive regarding speaking Spanish. Plaintiff's 56.1 Counterstatement asserts that D'Ambrosio "told plaintiff that her, Donatila [Melgar] and Alicia [Davila] were prohibited from speaking Spanish while at work." (Pl.'s 56.1 Counterstmt. ¶ 69.) However, Defendants' memorandum of law cites to the Amended Complaint and states that "plaintiff alleged that her boss, Ms. D'Ambrosio, specifically instructed her to direct her Spanish-speaking coworkers to stop speaking in their native language in the workplace amongst each other because this made her feel uncomfortable." (Defs.' Br. at 8 (citing Am. Compl. ¶¶ 18-19).) Curiously, the paragraphs of the Amended Complaint

Defendants argue that Plaintiff has similarly failed to establish a retaliation claim. (Defs.' Br. at 30-34.) Plaintiff's misconduct charges were founded in information obtained by individuals other than D'Ambrosio. (Def.'s Br. at 31.) Moreover, the "alleged adverse employment actions plaintiff complains of were in motion and/or the culmination of an ongoing process which predated the alleged protected activity, and thus there can be no retaliation." (Def.'s Br. at 34.)

Defendants also argue that D'Ambrosio is entitled to qualified immunity regarding Plaintiff's Section 1983 claim. (Defs.' Br. at 14-17.) At the time that D'Ambrosio issued her directive that Plaintiff and other employees not speak Spanish in the workplace, it was not clearly established that an English-only policy was unlawful and the Second Circuit still has not established that bilingual employees have a constitutional right to conduct business in a foreign language. (Defs.' Br. at 17-19.) Defendants also argue that Plaintiff has failed to set forth a claim for municipal liability. (Defs.' Br. at 19-23.) Defendants allege that D'Ambrosio, a mid-level manager who did not have hiring

---

cited by Defendants assert only that the County had a policy of discrimination because Defendants "banned all Hispanic speakers from speaking Spanish while at work, while permitting employees of other ethnic backgrounds to speak in their non-English languages, such as Italian" and that D'Ambrosio was Plaintiff's supervisor and had the authority to hire, fire, and discipline DSS employees. (Am. Compl. ¶¶ 18-19.)

and firing authority, was not a final policymaker and thus could not have formulated an English-only policy for Section 1983 purposes. (Def.'s Br. at 21-22.)

### A.    Plaintiff's Opposition

Plaintiff alleges that she has stated a prima facie claim for discrimination based on race and national origin. (Pl.'s Br., Docket Entry 47, at 5.) Plaintiff is Puerto Rican and a member of a protected class and she was qualified for her position at DSS. (Pl.'s Br. at 5.) Further, Plaintiff suffered the following adverse employment actions: (1) being assigned a disproportionate amount of work by being required to make coffee for D'Ambrosio and others; (2) being prohibited from speaking Spanish in the workplace; (3) being stripped of her responsibilities and isolated from her colleagues; (4) having necessary documents and information withheld; (5) being denied the opportunity to interview temporary employees; (6) being transferred; (7) being suspended without pay; and (8) being constructively discharged. (Pl.'s Br. at 5.) Plaintiff also alleges that these adverse employment actions occurred under circumstances that give rise to a discriminatory inference because non-Hispanic employees were not required to make coffee and did not have their responsibilities stripped or documents withheld; non-Hispanic employees were permitted to speak in their native languages; and D'Ambrosio made derogatory comments about ethnicity. (Pl.'s Br. at 6-7.)

Plaintiff argues that Defendants have failed to proffer a non-discriminatory reason for these actions. (Pl.'s Br. at 7.) Plaintiff also argues that she was constructively discharged because: (1) her work environment was rendered "intolerable" as a result of harassment and retaliation, which persisted even after she complained to her union vice president, and (2) in 2012 Plaintiff was threatened with criminal prosecution if she did not resign. (Pl.'s Br. at 25.)

Plaintiff alleges that she has stated a claim for retaliation. Plaintiff engaged in the following protected activities: (1) internal complaints to Knappe, Commissioner Blass, and Barnes about D'Ambrosio requiring that she make coffee; (2) other internal complaints to Knappe, Commissioner Blass, and Barnes and requests to transfer out of D'Ambrosio's department; (3) internal complaints to Kramarcik; (4) filing the NYSDHR complaint; (5) advising Kramarcik, Baird, and Wittneban about her issues with D'Ambrosio and NYSDHR complaint; and (6) complaining to her union vice president about a hostile work environment. (Pl.'s Br. at 11-12.) Moreover, D'Ambrosio's actions against Plaintiff in response to her complaints constituted adverse actions that would dissuade a reasonable employee from making or supporting a discrimination charge. (Pl.'s Br. at 13-14.) These actions are causally related to Plaintiff's complaints based on temporal proximity and D'Ambrosio's awareness of Plaintiff's

complaints and "retaliatory animus towards her." (Pl.'s Br. at 16.)

Plaintiff alleges that her Section 1983 claims against the County should not be dismissed because the County was deliberately indifferent to her constitutional rights by failing to investigate her complaints or discipline D'Ambrosio. (Pl.'s Br. at 18.) Plaintiff avers that D'Ambrosio is not entitled to qualified immunity as she "should have known that creating a hostile work environment and treating plaintiff differently because of her race and national origin violated plaintiff's clearly established constitutional and statutory rights." (Pl.'s Br. at 20-21.)

B. Defendants' Reply

Defendants argue that Plaintiff has failed to establish adverse employment actions. Particularly, Plaintiff has not identified the specific work that D'Ambrosio withheld and, in any event, Plaintiff was not reprimanded or negatively evaluated by D'Ambrosio. (Defs.' Reply Br., Docket Entry 48-2, at 3.) Plaintiff has also failed to demonstrate that her inability to interview temporary employees resulted in a negative effect. (Defs.' Reply Br. at 4.) Further, Plaintiff's suspension and transfer were "warranted and vindicated" by the Arbitration Decision. (Defs.' Reply Br. at 4.) Plaintiff has also failed to proffer admissible proof that she was assigned more work than other

HEAP employees. (Defs.' Reply Br. at 4.) Defendants allege that they have non-discriminatory reasons for Plaintiff's suspension, demotion, transfer, internal investigation, and disciplinary arbitration as requiring bilingual employees to speak English while conducting official business is a "business necessity," and if Plaintiff was treated differently, it is because she was the only HEAP supervisor investigated for misconduct. (Defs.' Reply Br. at 5-6.)

Defendants also argue that Plaintiff has failed to set forth a retaliation claim. (Defs.' Reply Br. at 6-8.) Defendants allege that Kramarcik perceived Plaintiff's venting as warranting only "a sympathetic ear" and Baird reasoned that since Plaintiff's past issues with D'Ambrosio occurred in a different department, she was not authorized to act on those complaints. (Defs.' Reply Br. at 6-7.) Further, D'Ambrosio was "duty bound" to disclose Plaintiff's misconduct. (Defs.' Reply Br. at 6.) Plaintiff also failed to demonstrate any connection between Baird's negative performance evaluation and D'Ambrosio's alleged discrimination, and Plaintiff's complaints about her telephone and door access key were resolved after she brought them to D'Ambrosio's attention. (Defs.' Reply Br. at 7.) Additionally, Defendants aver that Plaintiff did not complain about racial discrimination prior to filing the NYSDHR Complaint. (Defs.' Reply Br. at 8.)

DISCUSSION

I.    Legal Standard

        Summary judgment will be granted where the movant
demonstrates that there is "no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
FED. R. CIV. P. 56(a).  A genuine factual issue exists where "the
evidence is such that a reasonable jury could return a verdict for
the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 248, 106 S. Ct. 2505, 2510 91 L. Ed 2d 202 (1986).  In
determining whether an award of summary judgment is appropriate,
the Court considers the pleadings, deposition testimony,
interrogatory responses, and admissions on file, together with
other firsthand information that includes but is not limited to
affidavits.  Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

        The movant bears the burden of establishing that there
are no genuine issues of material fact.  Gallo v. Prudential
Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  Once
the movant makes such a showing, the non-movant must proffer
specific facts demonstrating "a genuine issue for trial."  Giglio
v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at
*4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation
omitted).  Conclusory allegations or denials will not defeat
summary judgment.  Id.  However, in reviewing the summary judgment
record, "'the court is required to resolve all ambiguities and

draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

The Second Circuit has expressed the need for caution in awarding summary judgment to the defendant in a discrimination case where "the merits turn on a dispute as to the employer's intent." Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). Notwithstanding the Court's need for caution, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases. . . courts are not to treat discrimination differently from other ultimate questions of fact." Pacheco v. N.Y. Presbyterian Hosp., 593 F. Supp. 2d 599, 608-609 (S.D.N.Y. 2009) (internal quotation marks and citations omitted; alteration in original).

II. Title VII Discrimination Claim

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000-e 2(a)(1). Title VII claims are analyzed under the burden-shifting framework detailed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Ruiz v. Cty. of

Rockland, 609 F.3d 48, 491 (2d Cir. 2010). The plaintiff sets forth a prima facie claim for intentional discrimination by demonstrating that "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discriminatory intent." Sethi v. Narod, 12 F. Supp. 3d 505, 522 (E.D.N.Y. 2014) (internal quotation marks and citations omitted). Once the plaintiff makes a prima facie showing, the burden shifts to the defendant to proffer a "legitimate, nondiscriminatory reason for [the adverse employment] action." Id. If the defendant presents such a reason, the burden returns to the plaintiff to establish pretext by demonstrating that the defendant "was in fact motivated in part by the prohibited discriminatory animus." Id.

Defendants do not dispute that Plaintiff is a member of a protected class who was qualified for her position. Thus, the Court must determine whether Plaintiff suffered an adverse employment action that took place under circumstances that give rise to a discriminatory inference.

A.  Adverse Employment Action

An adverse employment action occurs where an employee suffers "a materially adverse change in the terms and conditions of employment." Tolbert v. Smith, 790 F.3d 427, 435 (2d Cir. 2015) (internal quotation marks and citation omitted). To qualify as

materially adverse, the change in the employee's working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (internal quotation marks and citation omitted). Examples of adverse employment actions include a termination, demotion evidenced by a wage or salary decrease, a "less distinguished title," material reduction of benefits, or a significant diminishing of material responsibilities. Sethi, 12 F. Supp. 3d at 523 (internal quotation marks and citation omitted).

Plaintiff alleges that Defendants subjected her to the following adverse employment actions: (1) prohibiting her from speaking Spanish in the workplace; (2) assigning her a disproportionate amount of work; (3) transferring her; (4) suspending her without pay; (5) stripping her of responsibilities; (6) isolating her from her colleagues, withholding necessary documents, and denying her the opportunity to interview temporary employees; and (7) constructively discharging her. (See Pl.'s Br. at 5.) The Court will address each alleged adverse employment action in turn.

1. Prohibition on Speaking Spanish

Requiring that an employee not speak Spanish around her co-workers "is not itself an adverse employment action." Lopez v. Flight Servs. & Sys., Inc., 881 F. Supp. 2d 431, 440 (W.D.N.Y. 2012) (Holding, in the context of employment discrimination claims

under 42 U.S.C. § 1981 and state law, that one plaintiff could not demonstrate an adverse employment action because he was not fired for speaking Spanish but the co-plaintiff raised triable issues of fact because he was fired for speaking Spanish in contravention of Defendants' English-only policy.). Plaintiff has failed to allege that any negative consequences inured from her speaking Spanish in the workplace; thus, D'Ambrosio's prohibition on speaking Spanish at HEAP does not constitute an adverse employment action.

### 2. Disproportionate Amount of Work

The assignment of a disproportionate amount of work may constitute an adverse employment action "if the additional work significantly changed the employee's responsibilities so as to diminish that worker's role or status, or exposed the worker to dangerous or extreme conditions not appropriate to her job classification." Chacko v. Conn., No. 07-CV-1120, 2010 WL 1330861, at *7 (D. Conn. Mar. 30, 2010) (internal quotation marks and citation omitted). See also Feingold v. N.Y., 366 F.3d 138, 153 (2d Cir. 2004) (Holding that the plaintiff's assignment of a "disproportionately heavy workload" constituted an adverse employment action.). The Court finds that being required to regularly make and serve coffee to D'Ambrosio did not so significantly change Plaintiff's responsibilities as to diminish her role or status. Additionally, Plaintiff has not adduced facts that demonstrate being required to make coffee rendered her

workload "disproportionately heavy" as compared to other HEAP employees. Accordingly, in the context of this case, the alleged requirement that Plaintiff make and serve D'Ambrosio coffee does not constitute an adverse employment action.

### 3. Job Transfers

Even absent a loss in salary, a "nominally lateral transfer" can be considered an adverse employment action under Title VII. Pacheco, 593 F. Supp. 2d at 617. "The key in this analysis is that the plaintiff must show that the transfer created a materially significant disadvantage." Id. 617-18 (internal quotation marks and citation omitted) (Holding that the plaintiff's transfer, even when viewed as involuntary, did not constitute an adverse employment action as it was not "tantamount to demotion" and did not result in a change in pay or benefits.). Plaintiff has not alleged that her respective transfers to the Southwest Center and to Food Stamps Under Care were "tantamount to demotion," altered her pay or benefits, or resulted in another material disadvantage. Accordingly, the Court finds that Plaintiff's transfers do not constitute adverse employment actions.

### 4. Suspension Without Pay

The Court finds that Plaintiff's thirty-day suspension without pay constitutes a materially adverse change in the conditions of Plaintiff's employment and, accordingly, is an

adverse employment action.  See, e.g., Page v. Conn. Dep't of Public Safety, Div. of State Police, 185 F. Supp. 2d 149, 157 (D. Conn. 2002) (Noting that in the Second Circuit, "suspension without pay constitutes adverse employment action."); Stembridge v. City of N.Y., 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) (Holding that a factfinder could conclude that the plaintiff's six-day suspension without pay constituted an adverse employment action).  But see Martinez v. Conn., State Library, 817 F. Supp. 2d 28, 41 (D. Conn. 2011) (Holding that the plaintiff's one-day suspension without pay did not constitute an adverse employment action).

### 5.  Other Employment Actions

Plaintiff relies on her deposition testimony to support the notion that D'Ambrosio stripped her of her responsibilities and withheld necessary documents.  Particularly, Plaintiff testified that she was not receiving work, her supervisory functions were being performed by D'Ambrosio, and her work was delegated to temporary employees.  (Pl.'s Dep. Tr. 218:22-219:3.) Plaintiff also testified that a list that she was required to reconcile was not provided to her until one month after it was received by HEAP.  (Pl.'s Dep. Tr. 213:25-214:7.)  Though Plaintiff's support is thin, the Court finds that Plaintiff has raised triable issues of fact as to whether D'Ambrosio's removal of work and responsibilities and withholding of necessary documents constitute adverse employment actions.  See Lorenzo v.

St. Luke's-Roosevelt Hosp. Ctr., 837 F. Supp. 2d 53, 61 (E.D.N.Y. 2011) (Holding that the plaintiff demonstrated a prima facie case for an ADEA adverse employment action where she was "gradually stripped of all her accounting and bookkeeping functions," not provided with information needed to prepare financial reports, and excluded from meetings.) (internal quotation marks and citation omitted).  But see Davis v. Verizon Wireless, 389 F. Supp. 2d 458, 469 (W.D.N.Y. 2005) (Holding, in the context of a Title VII sexual harassment claim, that "[w]ithin the context of this case, merely ignoring an employee or depriving her of being present at certain meetings or having certain responsibilities does not rise to the level of an adverse employment action.").

Plaintiff has also raised issues of fact regarding her assignment to a cubicle that rendered her isolated from her colleagues as such action could be "materially adverse" to her employment.  However, the Court finds that being denied the opportunity to interview temporary employees does not constitute an adverse employment action, particularly in light of Plaintiff's failure to allege that interviewing temporary employees had previously been one of her job responsibilities.

6.   Constructive Discharge

An employee is constructively discharged "when an employer 'intentionally creates a work atmosphere so intolerable that [the plaintiff] is forced to quit involuntarily.'"  Edwards

v. Huntington Union Free Sch. Dist., 957 F. Supp. 2d 203, 213 (E.D.N.Y. 2013) (internal quotation marks and citations omitted; alteration in original).  The constructive discharge standard is "demanding" and it will not be satisfied based on difficult or unpleasant working conditions or the plaintiff's preference to no longer work for her employer.  Id.  Rather, the plaintiff must present evidence: "(1) that the employer acted deliberately or intentionally in bringing about the complained of work conditions, and (2) that the conditions were 'intolerable.'"  Id. (citing Petrosino v. Bell Atl., 385 F.3d 210, 229 (2d Cir. 2004)).  Proof of the employer's specific intent is not required; however, the plaintiff must at least establish "that the employer's actions were deliberate and not merely negligent or ineffective." Petrosino, 385 F.3d at 229 (internal quotation marks, citation, and alterations omitted).  Additionally, the Court analyzes whether the employer's deliberate actions created work conditions sufficiently intolerable to compel resignation "objectively by reference to a reasonable person in the employee's position." Id. at 230.

Plaintiff appears to assert two theories of constructive discharge: Defendants' harassment and retaliation and the County's threat of termination.  The Court will address each theory in turn.

i.   Harassment and Retaliation

Plaintiff posits the conclusory allegations that her work environment was rendered "intolerable" due to "regular harassment and retaliation"; she was forced to take two medical leaves as a result of the harassment; and the retaliation and harassment continued after she complained to her union vice president about a hostile work environment.  (Pl.'s Br. at 25.) The Court disagrees and finds that Plaintiff has not stated a prima facie case for a hostile working environment and has failed to demonstrate that a reasonable person would be compelled to resign based on the alleged harassment and retaliation by Defendants. See O'Neal v. State Univ. of N.Y., No. 01-CV-7802, 2006 WL 3246935, at *12 (E.D.N.Y. Nov. 8, 2006) (Noting, in the context of a gender discrimination claim, that "constructive discharge is a 'worse case' harassment scenario, a hostile working environment 'ratcheted up to the breaking point,'" and holding that plaintiff's constructive discharge claim must fail based on her failure to demonstrate a hostile work environment.) (quoting Penn. State Police v. Suders, 542 U.S. 129, 147, 124 S. Ct. 2342, 2355 (2004)). Parenthetically, when Plaintiff complained to her union vice president in December 2011, she was no longer working in D'Ambrosio's department and the alleged harassment and retaliation consisted of increased supervision by Baird and Wittneban to the extent that Baird regularly passed by Plaintiff's office, accessed

Plaintiff's computer while she was at lunch, and required that Plaintiff submit her work to Wittneban each day. (See Pl.'s 56.1 Counterstmt. ¶ 125.)

    ii.  Threat of Criminal Charges

While an employer's threat of termination may suffice to establish a constructive discharge, it is not sufficient for the plaintiff to resign rather than face potential disciplinary charges or to merely fear being terminated. Dall v. St. Catherine of Siena Med. Ctr., 966 F. Supp. 2d 167, 177-78 (E.D.N.Y. 2013) (collecting cases). See also Bailey v. N.Y. City Bd. of Educ., 536 F. Supp. 2d 259, 266 (E.D.N.Y. 2007) ("[W]hen an employee resigns rather than respond to disciplinary charges, the resignation cannot later be construed as a constructive discharge."). But see Valdes v. N.Y. City Dep't of Envtl. Prot., No. 95-CV-10407, 1997 WL 666279, at *3 (S.D.N.Y. Oct. 27, 1997) (Noting that "an employer's clearly expressed desire that an employee resign has been held sufficient to find a constructive discharge."). Courts in this Circuit have also refused to find a constructive discharge where "an employee had an avenue through which he could seek redress for the allegedly 'intolerable' work atmosphere leading up to his resignation, but failed to take advantage thereof." Silverman v. City of N.Y., 216 F. Supp. 2d 108, 115-16 (E.D.N.Y. 2002), aff'd, 64 F. App'x 799 (2d Cir. 2003) (Declining to find a constructive discharge on the plaintiff's

employment discrimination claims under 42 U.S.C. §§ 1981 and 1983 where the plaintiff had the right to a pre-termination hearing under his collective bargaining agreement and New York Civil Service Law Section 75.) But see Gorham v. Town of Trumbull Bd. of Educ., 7 F. Supp. 3d 218, 232 (D. Conn. 2014) (Holding that the plaintiff established a constructive discharge as his termination was "inevitable" he was informed during a disciplinary hearing that possible disciplinary measures included suspension or termination and he was told by the defendant and his union representative that if he did not resign he would be "charged.").

Whether Plaintiff suffered a constructive discharge based on Defendants' threat of criminal charges presents a closer issue. Plaintiff testified that prior to the commencement of the Section 75 Hearing, her attorney was called into the office of the Director of Labor Relations along with the County Attorney. (Pl.'s Dep. Tr. 531:18-25.) Plaintiff's attorney advised her that Paul Margiotta[4] told him that if Plaintiff did not resign, her

---

[4] The Court is unable to find any reference in the record as to Mr. Margiotta's position or role with regard to this matter. However, the Amended Complaint asserts that on or about January 23, 2012, the Director of Labor Relations threatened that if Plaintiff did not resign, the Misconduct Charges would be forwarded to the District Attorney and the media and criminal prosecution would be recommended. (Am. Compl. ¶ 122.) As the parties do not appear to dispute that Plaintiff's then-counsel was advised that the Misconduct Charges would be forwarded to the District Attorney if Plaintiff failed to resign, the Court need not determine Mr. Margiotta's specific role in this incident.

Misconduct Charges would be forwarded to the District Attorney's office. (Pl.'s Dep. Tr. 531:18-25-532:7.) Defendants have not expressly denied this allegation.

The Court finds that Plaintiff has failed to present evidence from which a trier of fact could find that she was constructively discharged. First, the absence of a threat of termination or repeated threats that the Misconduct Charges would be forwarded to the District Attorney weighs against a constructive discharge. Cf. Dall, 966 F. Supp. 2d at 178 (factors considered in determining whether an employer's threat of termination establish a constructive discharge include whether such threats are "repeated, direct, or involved additional adverse conduct"). Plaintiff does not allege that she was threatened with termination and cites to only one occasion where her then-attorney was advised that the Misconduct Charges would be forwarded to the District Attorney if she did not resign. Indeed, while Plaintiff relies on Valdez for support, the plaintiff in that matter was told by his supervisors that "it was best if he resigned because he was going to be terminated." See Valdez, 1997 WL 666279, at *3. (internal quotation marks, citation, and alteration omitted). (See also Pl.'s Br. at 25.) While the Court acknowledges the seriousness of the alleged threat of criminal prosecution, Plaintiff has not proffered evidence that she was faced with the choice of

resignation or termination. Thus, it cannot be said that Plaintiff's termination was "inevitable."

Second, Plaintiff participated in a fair hearing. Plaintiff opposed the Misconduct Charges before an arbitrator and resigned after the Arbitration Hearing had concluded but before a decision was issued. (Defs.' 56.1 Stmt. ¶¶ 26-28.) Although Plaintiff sought to set aside the Arbitration Decision based on arbitrator misconduct, the State Court Decision upheld the Arbitration Decision. (Jan. 2, 2014 Decision, Defs.' Ex. S, Docket Entry 45-20.) Accordingly, Plaintiff's opportunity to address the Misconduct Charges at the Arbitration Hearing and the state court's rejection of her allegations of arbitrator misconduct also weighs against a finding that Plaintiff was constructively discharged. Cf. Stembridge, 88 F. Supp. 2d at 280-85 (Holding that the plaintiff failed to establish a constructive discharge because a rational juror could not find that a reasonable person in the plaintiff's position would have been compelled to resign "in light of the fair hearing and opportunity to be heard before an independent arbiter."). But see Varone v. City of N.Y., No. 02-CV-1089, 2003 WL 21787475, at *14 (S.D.N.Y. Aug. 4, 2003) (Holding, in the context of claims under the Rehabilitation Act of 1973, Americans with Disabilities Act, and state law, that the plaintiff presented sufficient evidence for a jury to find that he was constructively discharged despite the fact that he resigned a few

days after his hearing before an administrative law judge and a few weeks prior to his hearing before the NYSDHR.).

Thus, Plaintiff has failed to set forth a _prima_ _facie_ case for constructive discharge. In any event, even if the Court were to find that Plaintiff was constructively discharged, Plaintiff has failed to state a _prima_ _facie_ case that such constructive discharge took place under circumstances giving rise to an inference of discrimination. The County's threat of criminal prosecution was made at the commencement of the Arbitration Hearing in 2011, approximately two years after Plaintiff made her internal complaints and NYSDHR Complaint and D'Ambrosio made her "senorita" comment and English-only directive. (See Pl.'s Dep. Tr. 531:17-532:15.) Plaintiff has not proffered any evidence of discriminatory animus with respect to the County's threat of criminal prosecution.

B.    Inference of Discrimination

An inference of discrimination can be found in circumstances that include: (1) criticism of the employee's performance using "ethnically degrading" language; (2) "invidious comments" regarding other individuals in the employee's protected group; (3) treating individuals outside the employee's protected group more favorably; (4) the circumstances leading up to the adverse employment action; and (5) evidence that the employer treated the employee "less favorably than a similarly situated

36

employee outside his protected group." Setelius v. Nat'l Grid Elec. Servs. LLC, No. 11-CV-5528, 2014 WL 4773975, at *9 (E.D.N.Y. Sept. 24, 2014) (internal quotation marks and citations omitted). The standard for whether an inference of discrimination can be drawn is flexible and no specific type of proof is required. Id.

### 1. Suspension Without Pay

The Court finds that Plaintiff has failed to set forth a prima facie showing that her suspension without pay arose under circumstances giving rise to an inference of discrimination. Plaintiff was no longer working in D'Ambrosio's department at the time of her suspension. (Defs.' 56.1 Stmt. ¶¶ 22-23.) Plaintiff has not alleged that a similarly situated employee that engaged in the same behavior was not suspended without pay, nor has she alleged that any racially charged comments were made in close proximity to her suspension. See, e.g., Shepherd v. BCBG Max Azria Grp., Inc., No. 11-CV-7634, 2012 WL 4832883, at *16 (S.D.N.Y. Oct. 11, 2012), report and recommendation adopted, 2012 WL 6150854 (S.D.N.Y. Dec. 10, 2012) (Holding that a comment made one year before the plaintiff's termination did not establish discriminatory animus). In any event, Defendants' filing of the Misconduct Charges constitutes a legitimate, non-discriminatory reason for suspending Plaintiff without pay pending the determination of those charges. (See Oct. 18, 2010 Ltr., Defs.' Ex. O, Docket Entry 45-16.)

2. <u>Other Adverse Employment Actions</u>

The Court finds that Plaintiff has made a <u>prima</u> <u>facie</u> showing that her remaining adverse employment actions--being stripped of her responsibilities, having necessary documents withheld, and being placed in an isolated cubicle--arose under circumstances giving rise to an inference of discrimination. Plaintiff alleges that these adverse actions took place during August and October 2009. (Pl.'s 56.1 Counterstmt. ¶¶ 82-83, 90, 92; <u>see</u> <u>supra</u> n.2.) D'Ambrosio issued her English-only directive in July 2009 and made the "senorita" comment in August 2009.[5] (Pl.'s 56.1 Counterstmt. ¶¶ 68-69, 77-79.) The temporal proximity of these incidents to the adverse employment actions raises an inference of discrimination. <u>See</u> <u>Setelius</u>, 2014 WL 4773975, at *9 (the events leading up to the adverse employment action may establish an inference of discrimination). Additionally, Plaintiff has alleged that other HEAP employees were permitted to speak in their native language in the workplace while she and other Hispanic employees were barred from speaking Spanish. (Pl.'s 56.1 Counterstmt. ¶ 72.)

Rather than asserting a non-discriminatory purpose for these adverse actions, Defendants essentially argue, somewhat

---

[5] As Plaintiff has relied on a disparate treatment theory of discrimination rather than a hostile work environment, the Court finds that D'Ambrosio's alleged reference to Ms. Vora as a "slumdog" is not relevant. (<u>See</u> Pl.'s 56.1 Counterstmt. ¶ 74.)

circuitously, that D'Ambrosio's stray "senorita" remark is not actionable under Title VII; that there is no English-only policy at DSS; courts in this Circuit have held that, in certain circumstances, an English-only workplace is not discriminatory; and that Plaintiff cannot prove discrimination because she is bilingual. (Defs.' Br. at 8-11.) The Court disagrees and finds that Plaintiff has proffered evidence of pretext and could satisfy her ultimate burden of demonstrating intentional discrimination.

Although the "'stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination,'" the comments at issue will no longer be considered "stray" if "'other indicia of discrimination are properly presented [so that] the jury has a right to conclude that they bear a more ominous significance.'" Johnson v. Cty. of Nassau, 480 F. Supp. 2d 581, 599 (E.D.N.Y. 2007) (internal quotation marks and citations omitted; alteration in original). The remarks at issue are "significant" where the plaintiff demonstrates their nexus to the adverse employment action. Id. As set forth above, Plaintiff has demonstrated the temporal proximity of the "senorita" comment to the adverse employment actions. Moreover, D'Ambrosio's "stray" remark is viewed in conjunction other indicia of discrimination, namely, D'Ambrosio's "English-only" directive.

Defendants' position that there is no English-only policy at DSS actually cuts against the notion that D'Ambrosio's

directive was non-discriminatory. While Defendants cite to decisions finding English-only policies to be non-discriminatory when they are based on "business necessity," if there was no DSS English-only policy than it follows that there was no business necessity in D'Ambrosio directing HEAP employees to cease speaking Spanish. (See Defs.' Br. at 9-13.) Moreover, the Court is unable to discern what D'Ambrosio's "business necessity" could be since she allegedly permitted HEAP employees to speak Italian. (Pl.'s 56.1 Counterstmt. ¶ 72.) Cf. Roman v. Cornell Univ., 53 F. Supp. 2d 223, 237 (N.D.N.Y. 1999) (Holding that the defendants had "legitimate business reasons" for an English-only policy where their goals were to minimize interpersonal conflicts, and prevent feelings of exclusion or that individuals are being spoken about in a foreign language.).

The Court is mindful that courts have been "leery" of finding pretext regarding an English-only policy where, as here, the plaintiff is a bilingual. Perez v. N.Y. and Presbyterian Hosp., No. 05-CV-5749, 2009 WL 3634038, at *14 (S.D.N.Y. Nov. 3, 2009). The Court also acknowledges that HEAP's utilization of temporary employees to assist the County's Spanish-speaking population undercuts an inference of discrimination to the extent that employees were asked or required to speak Spanish at work. Id. However, to the extent that D'Ambrosio's directive can even be considered a "policy," courts have also been "leery" of English-

only policies that prohibit even non-work related communications.[6]
Id. at *13.  See Pacheco, 593 F. Supp. 2d at 613 (noting that
courts have "distinguished between various types of language-
restriction policies, being more forgiving of those that apply
only to work-related communication and to bilingual employees.").
Additionally, to the extent that other instances of "racial or
ethnic hostility" by Defendants are considered in analyzing an
English-only policy, the Court finds that a reasonable juror could
determine that D'Ambrosio's "senorita" remark constitutes evidence
of racial animus with respect to the "English-only" directive.
See also Pacheco, 593 F. Supp. 2d at 612 ("the courts consider,
among other facts, whether there is evidence that the employer, in
addition to adopting an English-only policy, has exhibited other
forms of racial or ethnic hostility").

        Parenthetically, issues of fact exist regarding
Plaintiff's cubicle assignment.  Plaintiff alleges that D'Ambrosio
was responsible for assigning cubicles at the Smithtown Center.
(Pl.'s 56.1 Counterstmt. ¶¶ 90, 93.)  While D'Ambrosio testified
that "someone in administration" was responsible for overseeing

_____

[6] Although Defendants' reply asserts that an exception to
D'Ambrosio's "non-policy" existed to permit "employees to speak
whatever language they chose in the breakroom during recognized
break periods," Defendants fail to cite to any evidence that
would support such an allegation.  (Defs.' Reply at 5.)  At the
very least, an issue of fact exists with respect to any
"exceptions" to D'Ambrosio's prohibition on speaking Spanish in
the workplace.

the HEAP relocation, she also testified that she "worked with the supervisors to set [ ] up" the cubicle assignments. (D'Ambrosio Dep. Tr., Defs.' Ex. D, Docket Entry 45-5, 75:9-12, 76:8-12.)

Accordingly, summary judgment on Plaintiff's Title VII discrimination claim is DENIED with respect to Plaintiff's claim that being stripped of her responsibilities, isolated from her co-workers, and having information withheld constituted adverse actions that took place under circumstances giving rise to an inference of discrimination. The Court GRANTS summary judgment with respect to Plaintiff's alleged adverse employment actions of being prohibited from speaking Spanish, assigned a disproportionate amount of work, involuntarily transferred, suspended without pay, and constructively discharged.

III. <u>Title VII Retaliation Claim</u>

To state a <u>prima</u> <u>facie</u> case for retaliation, the plaintiff must demonstrate: "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." <u>Richardson v. Comm'n on Hum. Rights & Opportunities</u>, 532 F.3d 114, 123 (2d Cir. 2006) (internal quotation marks and citation omitted). The <u>McDonnell Douglas</u> burden shifting framework is also utilized in analyzing a Title VII retaliation claim. <u>Pacheco</u>, 593 F. Supp. 2d at 626. The plaintiff is not required to prove that her

underlying discrimination complaint was meritorious; rather, she must establish that her complaint "was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2015) (internal quotation marks and citation omitted). The plaintiff's burden is "de minimis" and the Court's role is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

    A.   Protected Activity

Plaintiff alleges that she engaged in the following protected activities: (1) internal complaints to Knappe, Commissioner Blass, and Barnes about D'Ambrosio requiring that Plaintiff to make coffee; (2) other internal complaints to Knappe, Commissioner Blass, and Barnes and requests to transfer out of D'Ambrosio's department; (3) internal complaints to Kramarcik; (4) filing the NYSDHR Complaint; (5) advising Kramarcik, Baird, and Wittneban about her NYSDHR complaint and issues with D'Ambrosio; and (6) complaining to her union vice president about a hostile work environment. (Pl.'s Br. at 11-12.)

"A protected activity is action that protests or opposes statutorily prohibited discrimination." Giscombe v. N.Y. City Dep't of Educ., 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014) (internal

quotation marks and citation omitted).  Protected activities under Title VII include informal complaints to the plaintiff's supervisors, commencing litigation, or filing a formal complaint. Id.  However, the plaintiff's complaint must have allowed her employer to "reasonably have understood that [plaintiff's] opposition was directed at conduct prohibited by Title VII." Johnson v. City Univ. of N.Y., 48 F. Supp. 3d 572, 577 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).  See also Lopez, 881 F. Supp. 2d at 444 ("'[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's [complaint] was directed at conduct prohibited by Title VII.'") (quoting Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998)) (alterations in original).

Plaintiff's complaint to Knappe, Commissioner Blass, and Barnes about D'Ambrosio requiring that she make and serve coffee does not constitute a protected activity as Defendants could not have reasonably understood that Plaintiff was opposing discriminatory conduct by lodging general complaints about her supervisor's unfair treatment.[7]    (See Pl.'s 56.1 Counterstmt.

---

[7] While not addressed in the parties' briefs, to the extent that Plaintiff alleges that her complaint, in writing, to Knappe and D'Ambrosio regarding her inability to make long distance calls constitutes a protected activity, the Court similarly finds that

¶ 65.) Conversely, it is beyond dispute that Plaintiffs' NYSDHR Complaint constitutes a protected activity.

Additionally, Plaintiff points to three other internal complaints: (1) an August 2009 meeting with Knappe; (2) a phone call with Knappe following Plaintiff's attendance at a conference in Albany in August 2009; and (3) Plaintiff's September 16, 2009 meeting with Commissioner Blass and Barnes. (See Pl.'s 56.1 Counterstmt. ¶ 80; Pl.'s Dep. Tr. 220:6-221:20, 310:24-312:5, 335:7-338:25.) These meetings and phone call do not constitute protected activities to the extent that Plaintiff requested transfers as "a transfer request is not a 'protected activity' within the meaning of [Title VII]." Bey v. I.B.E.W. Local Union #3 Union Reps., 374 F. App'x 187, 188 (2d Cir. 2010). However, the Court finds that Plaintiff's meetings and phone call with Knappe, Commissioner Blass, and Barnes constitute protected activities to the extent that Plaintiff lodged informal complaints regarding D'Ambrosio's "senorita" reference and prohibition on speaking Spanish in the workplace.

Plaintiff avers that in 2010, she complained to Kramarcik about D'Ambrosio requiring her to make coffee and "making plaintiff do chores for her because she is Hispanic." (Pl.'s 56.1

_____

such complaint would not have placed Defendants on notice that Plaintiff was opposing discriminatory conduct. (See Pl.'s 56.1 Counterstmt. ¶ 44.)

Counterstmt. ¶ 81.)  While Kramarcik testified at his deposition

that Plaintiff did not complain to him about D'Ambrosio, he also

testified that Plaintiff spoke to him, "in general," about her

issues with D'Ambrosio and advised that "she felt that Nancy was

asking her to do chores . . . coffee and things because she was

Hispanic."  (Kramarcik Dep. Tr., Pl.'s Ex. C., Docket Entry 47-5,

21:22-24:9.)[8]  The Court finds that Plaintiff has raised an issue

of fact as to whether her conversation with Kramarcik constitutes

an informal complaint and thus a protected activity.

        Plaintiff   merely   advising   Kramarcik,   Baird,   and

Wittneban  of  her  NYSDHR  complaint  and  previous  issues  with

D'Ambrosio   do   not   constitute   protected   activities   as   such

disclosures do not qualify as informal complaints and Defendants

would not have reasonably understood that Plaintiff was opposing

discrimination.  Additionally, Plaintiff's complaint to her union

vice  president  does  not  constitute  a  protected  activity  as

---

[8] The Court notes the inconsistency in Plaintiff's and
Kramarcik's respective deposition testimonies.  (Compare
Kramarcik Dep. Tr. 20:23-21:2 with Pl.'s Aff. dated March 20,
2015, Pl.'s Ex. F, Docket Entry 47-6, at 8-16, ¶ 25.)  While
Plaintiff and Kramarcik appear to be in agreement that they
spoke about D'Ambrosio making Plaintiff do "chores" during the
time that Kramarcik served as Plaintiff's supervisor, Plaintiff
indicates that this conversation occurred in 2010 and Kramarcik
testifies that this conversation occurred in 2009.  As
Defendants do not dispute that Kramarcik served as Plaintiff's
supervisor when she was transferred to the Southwest Center in
2010, the Court credits Plaintiff's testimony that her
conversation with Kramarcik occurred in 2010.

Defendants cannot be charged with knowledge of such complaint in the absence of evidence that Plaintiff's union vice president "actually brought plaintiff's discrimination complaints to the attention of [Defendants]." Edwards v. Jericho Union Free Sch. Dist., 55 F. Supp. 3d 458, 468 (E.D.N.Y. 2014).

   B.   Adverse Employment Action

        An adverse employment action, in the context of a Title VII retaliation claim, is an action that "'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S. Ct. 2405, 2409, 165 L. Ed. 2d 345 (2006)). In White, the Supreme Court held that Title VII's retaliation provision is broadly applicable to "'employer actions that would have been materially adverse to a reasonable employee or job applicant.'" Hicks, 593 F.3d at 165 (quoting White, 548 U.S. 53 at 57, 126 S. Ct. at 2409). The Second Circuit has articulated several principles derived from the White decision: (1) Title VII's anti-retaliation provision is broader than its anti-discrimination provision and "'extends beyond workplace-related or employment-related retaliatory acts and harms'"; (2) the requirement that the plaintiff demonstrate "material adversity" preserves the principle that Title VII does not create a code of general civility for the workplace; (3) although White

considers a reasonable employee's perspective and sets forth an objective standard, "'context matters'"; and (4) allegations of retaliation must be considered "both separately and in the aggregate" in determining whether an adverse action occurred because "even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." Id. (quoting White, 548 U.S. at 67-69, 126 S. Ct. 2405).

Plaintiff alleges that the following adverse actions were taken in retaliation for her complaints: (1) D'Ambrosio withheld documents from her; (2) D'Ambrosio stripped her of her responsibilities and isolated her from her colleagues; (3) D'Ambrosio acted hostile towards her; (4) she had desk, phone, and security badge issues; (5) D'Ambrosio "falsely reported" that she received a fraudulent HEAP benefit; (6) Section 75 charges were filed and she received a thirty day suspension without pay; (7) she was transferred to the Southwest Center and then to the Food Stamps Unit; (8) she received a negative evaluation; (9) she was subjected to increased supervision; (10) she was threatened with criminal prosecution if she failed to resign. (Pl.'s Br. at 12-13.)[9]

_____

[9] To the extent Plaintiff argues that her constructive discharge constitutes an adverse action for retaliation purposes, as set forth above, Plaintiff has failed to establish that she was constructively discharged. In any event, the Court finds that Plaintiff has not set forth a prima facie case that the County's threat of forwarding the Misconduct Charges to the District

Viewing Plaintiff's alleged adverse actions in the aggregate, the Court finds that Plaintiff has raised triable issues of fact as to whether the withholding of documents, stripping of responsibilities, hostility, assignment to an isolated cubicle, failure to receive a multiline telephone, and malfunctioning security badge constitute adverse actions. These incidents, to the extent they were intentional, would dissuade a reasonable employee from making a discrimination charge.

Putting aside any legitimate, non-discriminatory reasons offered by Defendants, the Court finds that Plaintiff has also raised issues of fact as to whether D'Ambrosio's report that Plaintiff received a fraudulent HEAP benefit and Defendants' threat of criminal prosecution constitute adverse actions. The Court also finds that Plaintiff has raised issues of fact as to whether her negative performance evaluation constitutes an adverse action. See Siddiqi v. N.Y. City Health & Hospitals Corp., 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008) ("Unlike in discrimination claims, negative performance reviews, standing alone, can be considered an adverse employment action [on a retaliation claim]."). Similarly, Defendants' filing of Section 75 charges

---

Attorney absent her resignation was made in retaliation for her internal complaints and NYSDHR Complaint. Again, the County's threat of forwarding the Misconduct Charges to the District Attorney occurred years after Plaintiff engaged in protected activities and Plaintiff has made no showing of causation with respect to such threat.

against Plaintiff and suspending her without pay also constitutes an adverse action.  See Giscombe, 39 F. Supp. 3d at 401 (holding that "[p]laintiff was subjected to adverse employment action when he was suspended for six months without pay and when he was subjected to disciplinary charges") (citations omitted).

However, Plaintiff has not alleged facts that would establish that her respective transfers to the Southwest Center and Food Stamps Under Care constitute adverse actions and the Court finds that these transfers were nothing more than a "mere inconvenience" or an "alteration of [plaintiff's] job responsibilities."  Kessler v. Westchester Cty. Dep't of Social Servs., 461 F.3d 199, 207 (2d Cir. 2006) (internal quotation marks and citation omitted).  Additionally, Plaintiff's increased supervision does not constitute an adverse action based on her failure to allege that she suffered "unfavorable consequences" as a result of that increased supervision.  Chacko, 2010 WL 1330861, at *13 ("[t]o qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences") (internal quotation marks and citation omitted).

C.  Causation

To establish causation, the plaintiff must show that the defendant's retaliation was the "but for" cause of the adverse employment action.  Husser v. N.Y. City Dep't of Educ., --- F. Supp. 3d ---, 2015 WL 5774741, at *13 (E.D.N.Y. Sept. 30,

2015).  See also Vega, 801 F.3d at 91 ("[B]ut-for causation does not[, however,] require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.") (internal quotation marks and citation omitted; alteration in original).  The plaintiff may demonstrate that the defendant's retaliation was a "but-for" cause of the adverse employment action by setting forth "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action" from which it could be concluded that the defendant's explanations were mere pretext. Zann Kwan, 737 F.3d at 846.  "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action."  Vega, 801 F.3d at 90 (citation omitted).  See also Zann Kwan, 737 F.3d at 844 (the "but-for" standard for causation on a Title VII retaliation claim does not change the plaintiff's ability, at the prima facie stage on a summary judgment motion, to establish causation indirectly by way of temporal proximity).

      1.  Adverse Actions at HEAP

      Plaintiff has raised triable issues of fact that Defendants retaliated against her by withholding documents, stripping her responsibilities, acting hostile, assigning her an isolated cubicle, depriving her of a multiline phone, providing a

malfunctioning badge, and failing to assign her work at the Smithtown Center. These incidents occurred in August and October 2009 and Plaintiff made internal complaints to Defendants in August and September of that same year. Moreover, Plaintiff alleges that D'Ambrosio became aware of her internal complaints to Knappe in September 2009. (Pl.'s 56.1 Counterstmt. ¶ 86.) Indeed, D'Ambrosio testified at her deposition that she learned that Plaintiff complained about her to Knappe "sometime in September of 2009." (D'Ambrosio's Dep. Tr. 67:17-21.) Defendants have not proffered a legitimate, non-discriminatory reason for these actions other than to generally assert that HEAP switched to a call center at the Smithtown Center that D'Ambrosio was not involved in, DSS "rectified the issue" when Plaintiff complained about her inability to make long distance calls, and SIU was responsible for programming security badges. (Defs.' 56.1 Stmt. ¶¶ 44-47.)

2. Negative Performance Evaluations

The Court finds that Plaintiff has not demonstrated causation with respect to her negative performance evaluation. Baird completed Plaintiff's negative performance evaluation and it is not disputed that Baird did not work with D'Ambrosio "in any capacity or form." (Defs.' 56.1 Stmt. ¶ 41.) Plaintiff's allegation that performance evaluations are generally completed on the employee's start date "anniversary" and her evaluation was

completed after working under Baird's supervision for only a short time does not suffice to establish direct causation. (Pl.'s 56.1 Counterstmt. ¶¶ 115-16.) Moreover, Plaintiff has not established indirect causation as her protected activities took place in August through October 2009 and Baird's performance evaluation was completed over one year later in December 2010.

### 3. D'Ambrosio's Report of Misconduct

The Court finds that Plaintiff has made a _prima_ _facie_ showing that retaliation was the cause of D'Ambrosio reporting Plaintiff's receipt of HEAP benefits. The parties do not dispute that SIU began investigating Plaintiff in or about October 2009, when she and other employees met with an SIU investigator. There is also no dispute that D'Ambrosio reported Plaintiff's allegedly fraudulent HEAP applications to SIU, although Defendants aver that her report was based on information disclosed to her by other DSS employees. (Defs.' 56.1 Stmt. ¶ 18; Pl.'s 56.1 Counterstmt. ¶ 18.) D'Ambrosio's report was made within one to two months of Plaintiff's internal complaints and Plaintiff alleges that D'Ambrosio became aware of her complaints to Knappe in September 2009. (Pl.'s 56.1 Counterstmt. ¶¶ 86-87.) Moreover, D'Ambrosio's report regarding Plaintiff's HEAP benefits coincides with the adverse actions that took place in October 2009. As previously noted, Plaintiff also alleges that she informed D'Ambrosio before

making her HEAP applications.  (Pl.'s 56.1 Counterstmt. ¶¶ 105-106.)

However, Defendants have proffered a legitimate, non-discriminatory reason for D'Ambrosio's report regarding Plaintiff's HEAP benefit--namely, that D'Ambrosio was "duty bound" to report misconduct when it was brought to her attention by DSS employees.  (Defs' Reply Br. at 6.)  Defendants also allege that Plaintiff did not advise D'Ambrosio that she would be applying for a HEAP benefit.  (Defs.' 56.1 Stmt. ¶ 52.)

Whether Plaintiff has established pretext presents a closer issue.  As previously noted, Plaintiff's burden of establishing "but-for" causation does not require that she proffer evidence that retaliation was the sole reason for Defendants' retaliation; however, Plaintiff must demonstrate that "the adverse action would not have occurred in the absence of the retaliatory motive."  Zann Kwan, 737 F.3d at 845-46 (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. ---, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013)).  While Plaintiff has raised an issue of fact as to whether she informed D'Ambrosio prior to filing the HEAP applications, she does not dispute that D'Ambrosio's report was also based on information provided by other HEAP employees.  (Pl.'s 56.1 Counterstmt. ¶ 18.)  Moreover, Plaintiff has not established that D'Ambrosio would not have reported her receipt of HEAP benefits in the absence of a retaliatory motive.  Although

D'Ambrosio's report was made within months of Plaintiff's internal complaints, "'temporal proximity--while enough to support a prima facie case--[is] insufficient to establish pretext.'" Dall, 966 F. Supp. 2d at 195 (quoting Ben-Levy v. Bloomberg, L.P., 518 F. App'x 17, 19 (2d Cir. 2013)). The Court finds that a reasonable jury could not find that D'Ambrosio would not have reported Plaintiff's receipt of HEAP benefits had Plaintiff not made internal complaints. See Dall, 966 F. Supp. 2d at 196 (holding that Plaintiff failed to establish pretext regarding his retaliation claim and noting that the defendant "demonstrated that Plaintiff was facing discipline in response to his own conduct, not his sexual harassment complaint").

### 4. Section 75 Charges and Suspension

Plaintiff has failed to establish causation with respect to Defendants filing Section 75 charges and suspending her without pay. Again, Plaintiff's informal complaints were made in August and September 2009 and her NYSDHR Complaint was filed in October 2009 and sent to Defendants in early November 2009. (Pl.'s 56.1 Counterstmt. ¶¶ 5, 94; Pl.'s NYSDHR Complaint, Pl.'s Ex. I, Docket Entry 47-6, at 25-29.) While SIU met with Plaintiff in October 2009, Defendants did not file Section 75 charges against Plaintiff until approximately one year later in October 2010. (Defs.' 56.1 Stmt. ¶¶ 13, 23.) Plaintiff has not asserted that other HEAP unit employees received HEAP benefits and were not reprimanded; indeed,

Plaintiff does not dispute that other HEAP unit employees were investigated by SIU and a temporary employee, Camille Bolster, was terminated because she "signed off" on her daughter's HEAP benefits application. (Pl.'s 56.1 Counterstmt. ¶ 17.) Accordingly, Plaintiff has failed to demonstrate that Defendants filed Section 75 charges against her in retaliation for her protected activities. In any event, Defendants have asserted a legitimate, non-discriminatory reason to the extent that they charged Plaintiff following an investigation by SIU and these charges were upheld both by an arbitrator and in a state court proceeding.

### 5.  Threat of Criminal Prosecution

The Court finds that Plaintiff has failed to establish causation with respect to Defendants' statement that the Misconduct Charges would be forwarded to the District Attorney unless Plaintiff resigned. This statement was made "prior to the hearing being started." (Pl.'s Dep. Tr. 531:18-25.) Thus, the earliest date that Defendants could have made that statement was June 1, 2011, the first day of the Section 75 Hearing. (Defs.' 56.1 Stmt. ¶ 27.) However, even if the comment was made on June 1, 2011, that still results in an approximately two year gap between Defendants' statement and Plaintiff's internal complaints and NYSDHR Complaint. Additionally, Plaintiff has not made any allegations that even approach a showing of a causal connection between the County's statement and Plaintiff's internal complaints

and/or NYSDHR Complaint.  See Richardson, 532 F.3d at 123 (at the prima facie stage, Plaintiff is required to establish, inter alia, "a causal connection between the protected activity and the adverse employment action.") (internal quotation marks and citation omitted).

Accordingly, summary judgment is DENIED with respect to Plaintiff's claim that Defendants retaliated against her by withholding documents, stripping her responsibilities, acting hostile, assigning her an isolated cubicle, depriving her of a multiline phone, providing her with a malfunctioning badge, and failing to assign her work at the Smithtown Center.  The Court GRANTS summary judgment with respect to Plaintiff's claim that Defendants retaliated against her by issuing a negative performance evaluation, filing the Misconduct Charges and suspending her without pay, reporting her receipt of HEAP benefits, and threatening to forward the Misconduct Charges to the District Attorney if she did not resign.

IV.  Section 1983 Claims

A.  Nancy D'Ambrosio

To state a claim under Section 1983, the plaintiff must demonstrate "the violation of a right secured by the Constitution and laws of the United States, and . . . that the alleged deprivation was committed by a person acting under color of state law."  Feingold, 366 F.3d at 159 (internal quotation marks and

citation omitted). A prerequisite to an award of damages pursuant to Section 1983 is a finding that the individual defendant was personally involved in the deprivation of constitutional rights. Id. However, once it is established that the defendant acted under color of state law, the plaintiff's Equal Protection claim "parallels" her Title VII claim as "[t]he elements of one are generally the same as the elements of the other and the two must stand or fall together." Id. (citations omitted).

Defendants do not dispute that D'Ambrosio was acting under color of state law or that she was personally involved in the alleged constitutional deprivation. As the Court has already determined that Plaintiff has raised triable issues of fact with respect to her Title VII discrimination and retaliation claims, Plaintiff's Section 1983 claim against D'Ambrosio will accordingly "stand" with her Title VII claims. Thus, the Court need only determine the issue of qualified immunity.

A government official named as a defendant in her individual capacity is entitled to qualified immunity where: (1) federal law does not prohibit the defendant's conduct; or (2) if the defendant's conduct was prohibited, "the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred"; or (3) the defendant's conduct was objectively legally reasonable based on the clearly established law at the time the actions were taken.

Manganiello v. City of N.Y., 612 F.3d 149, 164 (2d Cir. 2010) (citations omitted).

Defendants argue that the "appropriate question" in analyzing D'Ambrosio's qualified immunity defense is "whether a reasonable DSS supervisor, similarly situated to D'Ambrosio, was on notice that bilingual HEAP employees, like Collazo, had a clearly established constitutional right to conduct HEAP business, during business hours on the work floor, in a language other than English." (Defs.' Br. at 18.) The Court declines to adopt this narrow view of the issues at hand. While D'Ambrosio's "English-only" directive is one aspect of Plaintiff's alleged constitutional deprivation, the true "appropriate question" is whether Plaintiff had a clearly established right to be free from discrimination and retaliation.[10] It is apparent that Plaintiff did, in fact, have such a clearly established right as "courts have long recognized that the Equal Protection Clause protects individuals from intentional discrimination under color of state law on the basis of race, national origin, or religion." Sulehria v. City of N.Y., 670 F. Supp. 2d 288, 323-24 (S.D.N.Y. 2009).

---

[10] Plaintiff appears to allege that D'Ambrosio is not entitled to qualified immunity regarding a hostile work environment claim. (Pl.'s Br. at 21.) As Plaintiff has not alleged facts that would establish a hostile work environment--or even alleged that she is asserting a hostile work environment claim--it is not necessary for the Court to address the issue of qualified immunity with respect to that argument.

As set forth above, Plaintiff has raised triable issues of fact as to whether Defendants discriminated and/or retaliated against her in contravention of Title VII. To the extent that these disputes of fact are resolved in Plaintiff's favor, D'Ambrosio would not be entitled to the defense of qualified immunity. See, e.g. Zagaja v. Vill. of Freeport, 10-CV-3660, 2012 WL 5989657, at *21-22 (E.D.N.Y. Nov. 20, 2012) (Denying summary judgment regarding the defendant's qualified immunity defense where the defendant would not be protected by qualified immunity if the jury concluded that he "intentionally discriminated against plaintiff and retaliated against her in violation of Section 1981, Section 1983, and the NYSHRL in the manner described by the plaintiff.") (collecting cases). Cf. Sulehria, 670 F. Supp. 2d at 323-24 ("[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the [unconstitutionality of the action], a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity") (collecting cases) (internal quotation marks omitted; alterations in original).

Accordingly, summary judgment on Plaintiff's Section 1983 claim against D'Ambrosio is DENIED as the issues of fact regarding Plaintiff's discrimination and retaliation claims must be determined before the Court decides the issue of qualified immunity. See Zagaja, 2012 WL 5989657, at *21.

B.    The County

A municipality will not be held liable pursuant to Section 1983 on a theory of respondeat superior for their employees' torts.  Bonds v. Suffolk Cty. Sheriff's Dep't, No. 05-CV-3109, 2006 WL 3681206, at *2 (E.D.N.Y. Dec. 5, 2006).  See also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  However, a municipality may be liable under Section 1983 "for actions taken pursuant to official municipal policy that cause constitutional torts."  Brewster v. Nassau Cty., 349 F. Supp. 2d 540, 549 (E.D.N.Y. 2004) (internal quotation marks and citation omitted).  A plaintiff demonstrates the existence of a municipal policy or custom by alleging, inter alia, that the municipal policymakers' failure to train or supervise their employees amounts to a deliberate indifference to the rights of individuals who interact with the municipal employees.  Bonds, 2006 WL 2681206, at *2.

To state a Section 1983 claim against a municipality based on deliberate indifference the plaintiff must establish "that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights."  Jones v. Town of East Haven, 691 F.3d 72, 81 (2d Cir. 2012).  See also Walker v. N.Y. City Dep't of Corr., No. 01-CV-1116, 2008 WL 4974425, *19 (S.D.N.Y. 2008) (Noting that

deliberate indifference can be established where the municipal defendant made no meaningful attempt to "take steps to foreclose the[] recurrence" of complaints of constitutional violations.). However, deliberate indifference involves a "stringent standard of fault" and requires evidence that the municipal official consciously disregarded a "known or obvious" consequence; mere negligence will not suffice. Jones, 691 F.3d at 81 (internal quotation marks and citation omitted). While one incident of misconduct that involves an employee below the policymaking level generally will not suffice to establish a policy or custom, "a single instance of deliberate indifference to subordinates' actions" will suffice to expose the municipality to Section 1983 liability. Greenaway v. Cty. of Nassau, 97 F. Supp. 3d 225, 237 (E.D.N.Y. 2015) (internal quotation marks and citation omitted).

Here, Plaintiff alleges that the County's failure to investigate her complaints to Commissioner Blass, Barnes, and "various supervisors" and failure to discipline D'Ambrosio amounts to deliberate indifference. (Pl.'s Br. at 17-18.) Defendants do not allege that any investigation was taken in response to Plaintiff's complaints but instead argue that Plaintiff did not raise a discrimination complaint prior to filing the NYSDHR Complaint and that D'Ambrosio's directive to cease speaking Spanish was a "legitimate business judgment." (Defs.' Reply at

62

8.) The Court finds that Plaintiff has raised triable issues of fact regarding a Section 1983 claim against the County.

As set forth above in the Court's discussion of Plaintiff's retaliation claim, certain of Plaintiff's internal complaints to Knappe and her meeting with Commissioner Blass and Barnes placed Defendants on notice that she was alleging racial discrimination. However, Plaintiff has not alleged that Knappe is a policymaker or that Knappe's failure to investigate her complaints was ratified by policymakers. Accordingly, the Plaintiff has not raised triable issues of fact with respect to her complaints to Knappe.

However, as Commissioner of DSS, Commissioner Blass is a policymaker for Section 1983 purposes. See, e.g., Cmty. Health Care Ass'n of N.Y. v. DeParle, 69 F. Supp. 2d 463, 475 (S.D.N.Y. 1999) (Holding that the Westchester County Department of Social Services Commissioner "unquestionably is a policymaker" for Section 1983 purposes.). Thus, it is not necessary for the Court to determine whether Barnes is a policymaker. As previously noted, during her meeting with Commissioner Blass and Barnes, Plaintiff complained about D'Ambrosio's directive that she and other Hispanic employees cease speaking Spanish in the workplace; accordingly, D'Ambrosio's alleged discriminatory practices were "made manifestly clear to the policymaker." Walker, 2008 WL 4974425, at *19. The Court concludes that Plaintiff has raised

triable issues of fact as to whether Commissioner Blass' inaction constituted deliberate indifference to Plaintiff's alleged constitutional deprivations. Accordingly, summary judgment is DENIED with respect to Plaintiff's Section 1983 claim regarding the County's deliberate indifference to her complaint to Commissioner Blass. To the extent that Plaintiff alleges a Section 1983 against the County based on its deliberate indifference to her complaints to Knappe, summary judgment is GRANTED.

CONCLUSION

For the forgoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Summary judgment on Plaintiff's Title VII discrimination claim is DENIED with respect to Plaintiff's claim that being stripped of her responsibilities, isolated from her co-workers, and having information withheld constituted adverse actions that took place under circumstances giving rise to an inference of discrimination. The Court GRANTS summary judgment on Plaintiff's Title VII discrimination claim with respect to Plaintiff's alleged adverse employment actions of being prohibited from speaking Spanish, assigned a disproportionate amount of work, involuntarily transferred, suspended without pay, and constructively discharged.

Summary judgment on Plaintiff's Title VII retaliation claim is DENIED with respect to Plaintiff's claim that Defendants retaliated against her by withholding documents, stripping her of

her responsibilities, acting hostile, assigning her an isolated cubicle, depriving her of a multiline phone, providing her with a malfunctioning badge, and failing to assign her work at the Smithtown Center. The Court GRANTS summary judgment on Plaintiff's Title VII retaliation claim with respect to Plaintiff's claim that Defendants retaliated against her by issuing a negative performance evaluation, filing the Misconduct Charges and suspending her without pay, reporting her receipt of HEAP benefits, and threatening to forward the Misconduct Charges to the District Attorney if she did not resign.

The Court DENIES summary judgment on Plaintiff's Section 1983 claim against D'Ambrosio. The Court DENIES summary judgment on Plaintiff's Section 1983 claim against the County regarding the County's deliberate indifferent to Plaintiff's complaint to Commissioner Blass and GRANTS summary judgment on Plaintiff's Section 1983 claim of the County's deliberate indifference to her complaint to Knappe.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:      February   17  , 2016
            Central Islip, New York

65